**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-3004

———

RONALD SOLOMON, JR.

Appellant

v.

PHILADELPHIA HOUSING AUTHORITY; RICHARD ZAPPILE, Chief Philadelphia
Housing Authority; MARC WOOLLEY

(Amended Per Clerk's Order dated 10/25/04)

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 02-cv-06630)
District Judge: Honorable Timothy J. Savage

———

Argued on July 14, 2005

Before: ALITO, VAN ANTWERPEN, and ALDISERT, Circuit Judges

(Filed: August 2, 2005)

Tshaka H. Lafayette, Esq. (Argued)
Lafayette Law Group, P.C.
21 South 12th Street, Suite 1050
Philadelphia, Pennsylvania 19107
    *Counsel for Appellant*

Mark J. Foley, Esq.

George A. Voegele, Jr., Esq. (Argued)

Victoria L. Zellers, Esq.
Klett Rooney Lieber & Schorling
2 Logan Square, 12th Floor
Philadelphia, Pennsylvania 19103
        *Counsel for Appellees*

————

OPINION OF THE COURT

————

VAN ANTWERPEN, Circuit Judge.

Before us is an appeal from a Memorandum and Order of the United States District Court for the Eastern District of Pennsylvania granting summary judgment in favor of the Philadelphia Housing Authority, Richard Zappile and Marc Woolley and denying the summary judgment motion of Ronald Solomon. In this action, Solomon alleges that he was constructively suspended and later terminated without appropriate levels of pre-deprivation procedural due process in violation of the Fourteenth Amendment to the United States Constitution. As we will explain more fully below, the District Court erred in concluding that Appellees' failure to afford Solomon notice and an opportunity to be heard before constructively suspending him was a procedural due process violation. However, this was harmless error, as this violation cannot be fairly ascribed to the Housing Authority, and Woolley and Zappile have qualified immunity. As such, we will affirm the decision of the District Court, but on different grounds.

## I. FACTS

Ronald Solomon, Jr. ("Appellant") was a police officer with the Philadelphia Housing Authority ("PHA") Police Department.[1]  On September 21, 2000, he was shot in the head and arm outside his parents' home by a man he later identified as one Harry Dantzler.  The assailant also stole Appellant's gun.  Because of his injuries, Appellant remained at the hospital for one week and was subsequently placed on a medical leave of absence from the date of his injury until January 21, 2001.

On October 4, 2000, Appellant testified at Dantzler's preliminary hearing and identified him as the man who had shot him.  Later that month, a Philadelphia Police Department investigator learned that one Kareem Harper-El, a juvenile incarcerated on unrelated charges, had been bragging about shooting an off-duty police officer in the head and taking his gun.  Upon further investigation, Harper-El confessed to shooting Appellant, explaining that he had been on the street selling drugs when Appellant took a bag of marijuana from him and refused to pay for it.  Harper-El also stated that Dantzler had nothing to do with the shooting.  On February 6, 2001, Appellant was interviewed by Assistant District Attorney Thomas Malone and several Philadelphia Police Department detectives regarding the Harper-El confession.  There is some disagreement as to what occurred when Appellant was confronted with Harper-El's confession; Appellant claimed

---

[1] At all times relevant to this suit, the PHA Police Department was a party to a collective bargaining agreement with the Fraternal Order of Housing Police, of which Appellant was a member.

that he continued to assert that Dantzler had shot him, but admitted that it was possible someone else may have shot him, while the investigators contend that Appellant confessed to lying about the circumstances of the shooting at the preliminary hearing. Regardless of what version actually took place, what is not in dispute is that soon after this interview the Philadelphia District Attorney made the decision to imminently charge Appellant with perjury and so informed Appellee Richard Zappile, Chief of the PHA Police Department.

At all times relevant to this suit, PHA had a policy of automatically terminating any officer who was arrested for any reason. After learning that Appellant's arrest was imminent, Chief Zappile contacted the PHA Human Resources Department and recommended that Appellant be kept on medical leave until the Philadelphia Police investigation was complete. Appellee Marc Woolley, PHA's General Manager of Human Resources, agreed to temporarily continue Appellant's medical leave and continue paying his benefits until he was arrested. Appellant contends that he repeatedly contacted the Human Resources Department to get permission to return to active duty, and that he was repeatedly told that he would be kept on leave. Appellant eventually contacted his union representative, who discouraged him from pursuing a grievance.[2] He testified that he was aware that he could file a grievance on his own without the union's assistance, but chose not to. Although Appellant had by this time exhausted his paid leave and was no longer

_____

[2] Appellant has not alleged that Fraternal Order of Housing Police breached its duty to fairly represent him.

4

earning salary, he still received full benefits for himself and his family.

The PHA Police Department received a draft affidavit of probable cause for Appellant's arrest from the Philadelphia Police Department in April 2001. However, in the weeks that followed, no other information concerning Appellant's supposedly imminent arrest was forthcoming. In June 2001, Chief Zappile initiated an internal PHA investigation into the allegations against Appellant. On July 25, 2001, a PHA detective interviewed Appellant and questioned him about his alleged perjury. Appellant stated that he told ADA Malone that it was possible someone else was at the shooting, and that he never admitted to lying about the circumstances of the shooting.

During the pendency of PHA's investigation, Harper-El pled guilty to attempted murder and other offenses related to the shooting. After reviewing the plea and the investigation's findings, Chief Zappile concluded that Appellant's conduct in this matter had violated the PHA Police Department's disciplinary code (specifically four counts of conduct unbecoming of an officer and one count of disobedience of order) and recommended to the Human Resources Department that Appellant be suspended with intent to dismiss. This recommendation was approved, and Appellant was served with a formal Notice of Suspension with Intent to Dismiss on November 1, 2001. Pursuant to the collective bargaining agreement, the termination was to be made effective on November 10, 2001.

Appellant's union president was present when the suspension papers were served,

and informed him the union would submit a grievance on his behalf. A grievance was filed on November 5, 2001, and, pursuant to the collective bargaining agreement, the ten-day period between Appellant's receipt of the notice and the effective date of his termination was tolled.[3] The grievance then proceeded to Step IV, where it was denied by Mr. Woolley. Under the collective bargaining agreement, Appellant had the right to arbitrate the grievance further, and he informed his union president that he would like to do so. However, he did not pursue this avenue further.

Appellant filed suit in the United States District Court for the Eastern District of Pennsylvania on August 6, 2002, alleging violations of 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 2000e, et. seq.; and the Pennsylvania Human Relations Act. Appellant's Complaint was amended on January 16, 2003, and for a second time on September 9, 2003. The Second-Amended Complaint claimed only a § 1983 violation committed by Appellees PHA, Woolley and Zappile.[4] On August 29, 2003, Appellant and PHA filed cross-motions for summary judgment. Appellees Woolley and Zappile filed similar motions on September 24, 2003. By Memorandum and Order, the District Court denied Appellant's motion and granted Appellees' Motions for Summary Judgment, concluding

_____

[3] Appellant was inconsistent during his deposition as to when exactly he received notice that he had been terminated. He first stated that he was not made aware of his termination until he received PHA's response to an EEOC charge. He later testified that he knew his termination was effective at Step III in the grievance process.

[4] In his Second-Amended Complaint, Appellant initially sought both legal damages and equitable relief. (See Appendix at 24A.) However, at oral argument, Appellant announced that he was no longer seeking recovery in equity.

only that the grievance and arbitration procedures contained in the collective bargaining agreement provided satisfactory due process protections that Appellant did not pursue. Appellant timely appealed to this Court.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction to consider Appellant's Second-Amended Complaint pursuant to 28 U.S.C. § 1331. Our jurisdiction is grounded in 28 U.S.C. § 1291.

The standard of review in an appeal from an order resolving cross-motions for summary judgment is plenary. Cantor v. Perelman, ___ F.3d ____, 2005 WL 1620323, *3 n.2 (3d Cir. July 12, 2005) (citing Int'l Union, United Mine Workers of Am. v. Racho Trucking Co., 897 F.2d 1248, 1252 (3d Cir. 1990)). When reviewing the propriety of a grant of summary judgment, we apply the same test that the district court should have applied. Bucks County Dep't. of Mental Health/Mental Retardation v. Pennsylvania, 379 F.3d 61, 65 (3d Cir. 2004); Morton Intern., Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 679 (3d Cir. 2003); Olson v. Gen. Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996). That is, a grant of summary judgment is appropriate only where the moving party has established that there is no genuine dispute of material fact, and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Emory v. AstraZeneca Pharm. LP, 401 F.3d 174, 179 (3d Cir. 2005). On a motion for summary judgment, a district court must view

the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor. Marzano v. Computer Sci. Corp., 91 F.3d 497, 501 (3d Cir. 1996) (citing Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994)).

## III. DISCUSSION

The District Court concluded that Appellant challenged only his placement on unpaid medical leave without a pre-suspension hearing, and that the grievance and arbitration procedures of the collective bargaining agreement provided satisfactory due process protections which Appellant chose not to pursue. We now consider whether Appellant was accorded appropriate levels of procedural due process with regard to both his suspension and his eventual termination,[5] and we will affirm the lower court's decision on different grounds.

### A.

The Fourteenth Amendment to the United States Constitution prohibits deprivations "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Under section 1983 of Title 42 ("§ 1983"),

---

[5] At argument, when asked why the District Court did not to address the termination claim, the parties stated that, after PHA's summary judgment motion was filed, but before the Court's decision, Appellant amended his Complaint to include the termination claim. We are unclear as to why the District Court did not address this issue, as any amendment is to relate back to the date the Complaint was originally filed, see Fed. R. Civ. P. 15, and the District Court treated its ruling as dispositive of the entire case. Nonetheless, it is clear that this claim was both raised and argued before the District court, and it is therefore properly before us.

> Every person who, under color of any [state law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (2003).

When analyzing a § 1983 claim alleging a state actor's failure to accord appropriate levels of procedural due process, our inquiry is bifurcated. We first must determine whether the asserted interest is encompassed within the Fourteenth Amendment's protection of life, liberty, or property; if so, we then ask whether the procedures available provided the plaintiff with adequate due process. Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000).

To have a property interest in a job, a person must have a legitimate entitlement to such continued employment. Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972). State law determines whether such a property right exists. See id.; Elmore v. Cleary, 399 F.3d 279, 282 (3d Cir. 2005). We have previously held that a "for-cause" termination provision in an employment agreement may establish a protected property interest. Linan-Faye Const. Co., Inc. v. Hous. Auth. of City of Camden, 49 F.3d 915, 932 (3d Cir. 1995) (holding that a contract right is recognized as property protected under the Fourteenth Amendment where the contract itself includes a provision that the state entity can terminate the contract only for cause). Moreover, "under Pennsylvania law, suspensions, like dismissals[,] are only proper for just cause; therefore, [employees have]

9

a separate property interest in not being suspended." Gniotek v. City of Philadelphia, 808 F.2d 241, 243 n.5 (3d Cir. 1986). The parties do not dispute that, under both Pennsylvania law and the collective bargaining agreement in effect between the Fraternal Order of Housing Police and PHA, suspensions and terminations must be for just cause. Accordingly, Appellant had a protected property interest in continued employment not interrupted by suspension or termination absent just cause.

We must now determine whether the pre-deprivation procedures used to effectuate Appellant's suspension[6] and termination were constitutionally adequate. The Supreme Court has consistently held that public employees who may be dismissed only for cause are entitled to a very limited hearing prior to termination, to be followed by a more

---

[6] We conclude that the extension of Appellant's medical leave without pay (but with benefits) was a *de facto* suspension. Nowhere in the collective bargaining agreement is suspension defined; as such, we must look to the common usage of that word. Suspension can be defined as "[t]he temporary deprivation of a person's powers or privileges, esp. of office or profession," Black's Law Dictionary, 1487 (8th ed. 2004), or "temporary removal from office or privilege," Merriam Webster's Collegiate Dictionary, 1187 (10th ed. 1996). It is undisputed that Appellant attempted to return to work after the expiration of his medical leave, but was prevented from doing so by Appellees. While semantically one could argue that he was already on leave, and thus continuing that leave did not technically remove him from office or deprive him of powers, the fact that this office or those powers would have been reinstated had Appellees not acted strongly suggests suspension. We therefore believe, contrary to Appellees' argument that Appellant was merely "continued on medical leave pending arrest by Philadelphia Police," that Appellant was in fact suspended after he attempted to return to work and was refused. Indeed, Appellees conceded at argument that, were it not for the perjury issue, Appellant would have been returned to work. Were we to find otherwise, an employer could easily clothe a suspension in another name and exempt itself from the strictures of the Fourteenth Amendment. We thus hereinafter refer to the decision to keep him on medical leave as a suspension.

comprehensive post-termination hearing. See, e.g., Gilbert v. Homar, 520 U.S. 924, 929 (1997) (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)). As the Court stated in Loudermill:

> An essential principle of due process is that a deprivation of life, liberty, or property be *preceded by notice and opportunity for hearing appropriate to the nature of the case* . . . . We have described the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest . . . . This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.

470 U.S. at 542 (footnotes, citations and internal quotation marks omitted) (emphasis added). Pre-termination process need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story. See Loudermill, 470 U.S. at 546; see also Copeland v. Philadelphia Police Dep't, 840 F.2d 1139, 1144-46 (3d Cir. 1988). Moreover, a due process violation "is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." Zinermon v. Burch, 494 U.S. 113, 126 (1990); see also Alvin, 227 F.3d at 116. Thus, in order to state a claim for failure to provide sufficient procedural due process, a plaintiff must have taken advantage of the processes that are available to her, unless those processes are unavailable or patently inadequate. Alvin, 227 F.3d at 116. The District Court, dealing only with the suspension, concluded that the grievance and arbitration procedures available to Appellant were constitutionally

11

sufficient and that he simply failed to employ them.[7]

**i.**

Turning first to Appellant's suspension,[8] we disagree with the District Court that the pre-deprivation process afforded him was constitutionally sufficient. In Gilbert, the Court noted that it had, on several occasions, found that post-deprivation process alone may satisfy the requirements of the Due Process Clause if a state must act quickly or if pre-deprivation process would be impractical. 520 U.S. at 930. Appellees here, however, have not demonstrated that either situation existed at the time Appellant was suspended. Therefore, we address whether the failure to accord pre-suspension procedural due process was constitutionally permissible. In Matthews v. Eldridge, 424 U.S. 319 (1976), the Supreme Court set forth the balancing test for determining whether the particular process accorded an individual is constitutionally sufficient:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

---

[7] We assume that the District Court meant that the grievance and arbitration procedures were constitutionally sufficient as a *post-deprivation* hearing.

[8] At several points during argument, Appellant characterized the February 2001 extension of medical leave as a "suspension with intent to terminate." Nowhere has it been alleged, let alone proven, that PHA or its employees had decided to terminate Appellant at that time. Indeed, it would seem unusual for PHA to have instituted a suspension with intent to terminate in February, continue to pay Appellant's benefits, and issue a second, identical suspension nine months later.

12

Id. at 335.

The private interest affected here is the continuation of Appellant's pay. Here, Appellant was kept on medical leave after the date when his leave pay expired. As the Supreme Court noted in Logan v. Zimmerman Brush Co., when determining what process is due, the length and finality of the deprivation must be considered. See 455 U.S. 422, 434 (1976). Appellant was not informed that his extended leave was constructively a suspension, nor was he informed how long he would be suspended or what would end this status. He was kept in limbo, receiving only his health and life insurance benefits. Indeed, no process at all was given.[9] Therefore, the private interest at stake was great, namely the deprivation of the means of Appellant's livelihood. See, e.g., FDIC. v. Mallen, 486 U.S. 230, 243 (1988).

The risk of erroneous deprivation was similarly great. At the time the decision to suspend Appellant was made, Appellees knew only that Philadelphia law enforcement planned to arrest Appellant. While we certainly do not call the veracity of these statements into question, what is clear is that, at the time of suspension, no arrest had

---

[9] He further did not receive a prompt, post-suspension hearing. Normally, the failure to accord a prompt post-deprivation hearing is a due process violation. However, where an employee is covered by a collective bargaining agreement that provides for a grievance process (that is constitutionally sufficient) *prior* to the deprivation, and the employee does not so grieve, the absence of post-deprivation process cannot be the basis for a due process claim. In this case, Appellant claims he was not promptly informed of the suspension. Consequently, his failure to take advantage of the pre-deprivation grievance process cannot, without more, defeat his due process claim.

been made, and there were conflicting stories regarding the basis of his arrest. In

Gilbert, the Supreme Court noted that the risk of erroneous deprivation was minimal, as

that plaintiff had already been arrested at the time he was suspended, thus giving the

Commonwealth of Pennsylvania reasonable grounds to support a suspension without

pay. 520 U.S. at 933. By contrast, PHA here knew only that the Commonwealth

*planned* to arrest Appellant at some future date. We conclude that, where an employer is

informed that an employee will imminently be arrested, and where that employee denies

the accusations leveled against him, there is a substantial risk of an erroneous

deprivation if that employee is suspended without any pre-deprivation process.[10]

Finally, the government's interest in suspending Appellant without any sort of

pre-deprivation process was minimal. Appellant was already on leave and could not

have returned without PHA medical approval. Hence, "affording [Appellant] an

opportunity to respond prior to termination would impose neither a significant

administrative burden nor intolerable delays." See Loundermill, 470 U.S. at 544. While

we do not underestimate the importance of quickly terminating an active officer who has

been arrested, the fact that Appellant had not yet been arrested and he wasn't "on the

streets" minimizes any remaining government interest in not according any measure of

pre-suspension process.

---

[10] An actual arrest, of course, would assure that there are reasonable grounds to support the suspension, and thus minimize the risk of an erroneous deprivation. See Gilbert, 520 U.S. at 933-34.

14

Balancing these factors, we think Appellant should have been accorded the minimal pre-deprivation process of notice and opportunity to be heard.  See id. at 542.  Such process would not have had to definitively resolved the dispute, but it would have accomplished the goal of pre-deprivation process, namely an initial check against a potentially mistaken decision.  Regardless of whether Appellant could have challenged the suspension through the grievance procedure after he had already been suspended does not remove all need for basic pre-deprivation Goss process.  See Goss v. Lopez, 419 U.S. 565, 581 (1975).  In finding otherwise, the District Court erred.[11]

**ii.**

Although not addressed by the District Court, we turn next to the November 2001 suspension with intent to terminate.  We conclude that no due process violation here lies.

Under Loudermill, "the adequacy of any hearing must be evaluated in reference to the two essential requirements of due process, . . . notice and an opportunity to respond." Gniotek, 808 F.2d at 244 (quoting Loudermill, 470 U.S. at 545) (internal quotation marks omitted).  Notice is sufficient if it apprises the vulnerable party of the nature of the charges and general evidence against him, and if it is timely under the particular circumstances of the case.  See Goss, 419 U.S. at 581.

It is undisputed that Appellant was interviewed by a PHA detective on July 25,

---

[11] In light of the nature of Appellant's job, the reason for the continuation of the medical leave, and the availability of a hearing through the grievance procedure, Judge Alito would hold that there was no due process violation.

15

2001. At that interview, which took place months prior to his eventual termination, Appellant was confronted with specific allegations that he had lied under oath and otherwise obstructed an investigation. He was also confronted with the evidence supporting these accusations. In response, he admitted he had told ADA Malone that it was possible someone else was present at the scene of the shooting, but categorically denied allegations that he had lied about the circumstances of the shooting. Thus, the record shows he was given notice of the charges against him, the evidence supporting these charges, and an opportunity to respond, all in a timely manner. This is all the pre-deprivation process that was due. See id.

Furthermore, Appellant received an adequate post-deprivation hearing. In Gniotek, we concluded that a suspension with intent to dismiss is a *de facto* dismissal, and such a deprivation occurs on the date an employee is suspended. 808 F.2d at 243. The grievance and arbitration process[12] that Appellant utilized satisfied the requirements for a post-termination hearing. See Matthews, 424 U.S. at 335; see also Dykes v. Southeastern Pa. Transp. Auth., 68 F.3d 1564, 1572 (3d Cir. 1995). Therefore, in addition to receiving pre-deprivation notice and opportunity to respond, Appellant also received a conclusive post-deprivation hearing. As such, no due process violation can lie.

---

[12] As Appellees note, the collective bargaining agreement between PHA and Appellant's union requires that the ten-day period prior to termination be tolled when a grievance is filed. After such a filing, a termination can only become effective upon completion of Step III of the grievance procedure.

16

**B.**

Because we have found a procedural due process violation to have occurred with regard to Appellant's suspension, we must now address Appellees' alternative arguments they are all immune from suit under § 1983. We agree, and hence will affirm the decision of the District Court, but on different grounds.[13]

**i.**

PHA contends on appeal that it cannot be liable for the violations alleged by Appellant pursuant to Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978), as Appellant has not demonstrated that any alleged deprivation was the result of an official government policy or custom.[14] To seek refuge under Monell, a local

---

[13] While unnecessary to our decision, we note that qualified immunity is available only for damages and not injunctive relief. Acierno v. Cloutier, 40 F.3d 597, 608 (3d Cir. 1994). Appellees thus could not have shielded themselves from Appellant's claims for injunctive relief. Appellant stated at oral argument that he decided to waive all prayers for injunctive relief, see supra, and thus relies only on his request for damages.

[14] While statutes of the Commonwealth state specifically that a housing authority organized under the Housing Authorities Law "shall in no way be deemed to be an instrumentality of [a] city or county, or engaged in the performance of a municipal function," 35 Pa. Cons. Stat. § 1544, this is not dispositive of the federal qualified immunity analysis. After Monell, it is clear that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies. 436 U.S. at 690. Counsel for Appellee did not dispute that PHA is a person at oral argument and we note that the United States District Court for the Eastern District of Pennsylvania concluded the same thing in its well-reasoned, albeit unpublished, Memorandum and Order in Wright v. Philadelphia Hous. Auth., 1994 WL 597716, *3 (E.D.Pa 1994), so do we find that PHA is within the definition of "person" as a local government entity for purposes of § 1983 liability. Counsel has also waived any immunity under the Eleventh Amendment.

government unit must demonstrate that a deprivation of a federally-protected right was not caused by its own unconstitutional (or illegal) policies or customs. See 436 U.S. at 691; see also Groman v. Township of Manalapan, 47 F.3d 628, 637 (3d Cir. 1995).

> A government policy or custom can be established in two ways. Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict. A course of conduct is considered to be a custom when, though not authorized by law, such practices of state officials [are] so permanent and well-settled as to virtually constitute law.

Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir.1990)) (internal quotation marks omitted).

According to the Second-Amended Complaint, the only individuals who participated in Appellant's suspension were Appellees Woolley and Zappile. Hence, if either of these employees had final decision-making authority (i.e. acted as a "policymaker") with regard to Appellant's suspension, PHA can be held liable for this deprivation. See City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988). Whether either individual is a policymaker is a question of state law. Id. at 142.

Under the Pennsylvania Housing Authorities Law, 35 Pa. Cons. Stat. § 1541, et. seq., a housing authority is governed by a Board of Commissioners which has final policymaking authority. See 35 Pa. Cons. Stat. § 1545 (2003); 35 Pa. Cons. Stat. § 1547 (2003) ("An Authority may delegate to one or more of its agents or [employees] such of its powers as it shall deem necessary to carry out the purposes of this act, *subject always to the supervision and control of the Authority*.") (emphasis added). In his deposition,

18

Appellant conceded that Woolley nor Zappile could not, on their own, authorize a suspension or termination, but rather such power was vested exclusively in Executive Director Carl Greene. (Supplemental Appendix at A-252.) Given that no final employment decision, be it suspension or termination, can ever be made by either Woolley or Zappile in their individual capacities, they are not PHA policymakers. Moreover, no evidence has been presented indicating that a policymaker (in this case, either Director Greene or the Authority's Board of Commissioners) had any hand in Appellant's suspension. Therefore, the decision to suspend Appellant cannot be fairly ascribed to PHA itself as an official policy or practice under Monell, and consequently PHA cannot be held liable for their failure to provide pre-suspension due process.

Moreover, any failure to accord Appellant appropriate levels of pre-suspension due process in this case was not pursuant to any custom. A custom under Monell can usually not be established by a one-time occurrence. See Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985). ("[A] single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."). Appellant has presented no evidence that any other PHA employee has ever been suspended in the same manner as he was, and as we have determined supra, the actions of Appellees Woolley and Zappile could not create policy, official or otherwise. As such, this suspension was, at most, an isolated mistake

19

by two inferior officers.

For these reasons, PHA cannot be held liable as a local government entity under § 1983 pursuant to Monell for any failure to accord Appellant appropriate due process prior to his suspension.

**ii.**

Turning to the individual Appellees, both sued in their personal capacities, we conclude that qualified immunity attaches.[15] The Supreme Court has laid out a clear, two-part analysis for determining whether an officer is protected by qualified immunity. See Wilson v. Layne, 526 U.S. 603 (1999). First, a court must consider whether a constitutional right has been violated. Id. at 609. Second, a court should determine whether it is a clearly established right that a reasonable officer should know of. Id. at 615.

As we have explained, the failure to accord Appellant pre-suspension due process in this case was a constitutional violation. Thus, we turn to whether a reasonable officer in either Woolley or Zappile's positions should have known as such. Whether or not a right is clearly established is a particularized determination that must be made in light of

---

[15] This conclusion does not make our Monell analysis supra unnecessary. See Parrish v. Luckie, 963 F.2d 201, 207 (8th Cir. 1992) ("A public entity or supervisory official may be liable under § 1983, even though no government individuals were personally liable."); compare City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.").

the specific facts of a case, and not as a generalized proposition. See Saucier v. Katz, 533 U.S. 194, 206 (2001). "In order to conclude that the right which the official allegedly violated is 'clearly established,' the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 635 (1987).[16] A right may be clearly-established even if there is no "previous precedent directly on point." Good v. Dauphin County Soc. Servs. for Children & Youth, 891 F.2d 1087, 1092 (3d Cir. 1989). "The ultimate issue is whether . . . reasonable officials in the defendants' position at the relevant time could have believed that, in light of what was in the decided case law, that their conduct would be lawful." Id.

After careful consideration, we conclude that, under the facts of this case and the slim case law on point, a reasonable officer in Woolley or Zappile's position would not have known that pre-suspension notice was constitutionally required in this case. Perhaps most telling of this fact is the Supreme Court's reversal of our categorical statement in Gilbert that any suspension without pay must be preceded by some measure

---

[16] We note that several courts have concluded that, under particular fact patterns, it is not clearly-settled that the protections of the Due Process Clause extend to discipline short of termination of public employees. See Gilbert, 520 U.S. at 929; see also Strouss v. Michigan Dep't. of Corr., 250 F.3d 336, 345 (6th Cir. 2001); Romano v. Canuteson, 11 F.3d 1140, 1142 (2d Cir. 1993); Myers v. Shaver, 245 F.Supp.2d 805, 815 (W.D.Va. 2003); but see Lickiss v. Drexler, 141 F.3d 1220, 1222 (7th Cir. 1998); Finkelstein v. Bergna, 924 F.2d 1449, 1451 (9th Cir. 1991).

of pre-deprivation process in all instances. <u>See</u> 520 U.S. at 930.[17]  Without more guidance, Appellant's right to pre-suspension process in this case was not well-settled, and Woolley and Zappile are entitled to qualified immunity.

## C.

Finally, we briefly address the motion for costs and sanctions pending before the Court regarding the Appendix to Appellant's Brief.  In that motion, Appellees contend that Appellant unreasonably refused to include documents in the Appendix that they had requested be included.  Under Federal Rule of Appellate Procedure 30(b), it was the duty of Appellant to include all documents noticed by Appellees as reasonably necessary to support their brief, and it was the duty of Appellees to only include documents reasonably necessary to that end.  <u>See</u> Fed. R. App. P. 30(b).

According to the Appellees, Appellant failed, despite repeated requests, to include all of the exhibits to their Motions for Summary Judgment before the District Court. However, Appellees did not specify which pages were relevant to their appeal.  The documents that Appellees requested to be included, in their entirety, amounted to a reasonably-sized tome.  What is most interesting is that, when Appellees ultimately filed their Supplemental Appendix, they had done what they had refused to do for Appellant: include only those portions of the various documents which were required to support their brief.  While counsel for Appellant should have contacted his counterpart and

---

[17] Moreover, Appellant has not demonstrated that either Woolley or Zappile knew that the extension of Appellant's medical leave was in fact a constructive suspension.

explained his position on their submission requests *prior* to filing the Appendix with the Court (especially after he had initially agreed to Appellees' submission requests), Appellees should have made a good faith effort to limit their document requests to what was truly relevant to the appeal.

We conclude that neither party is completely blameless with regard to the Appendix, and as such, we feel sanctions would be inappropriate in this case. We therefore deny Appellees' motion.

### IV. CONCLUSION

For the foregoing reasons, we reverse the District Court's holding that Appellant received appropriate levels of pre-suspension procedural due process, but affirm its ultimate conclusion as to Appellees' liability based upon Monell and the doctrine of qualified immunity. While not addressed by the District Court Memorandum and Order, we further conclude that Appellant received appropriate levels of procedural due process prior to his termination. Finally, we deny Appellees' motion for sanctions regarding the preparation of the Appendix.